WEST *v.* STATE.

Oct. 19, 1953

No. 38827 39 Adv. S. 70 67 So. 2d 366

*R. M. Allen* and *J. M. Foreman,* Indianola, for appellant.

*Joe T. Patterson,* Assistant Attorney General, Jackson, for appellee.

McGEHEE, C. J.

On Wednesday night, April 16, 1952, the appellant, Herman Lee West, a 31-year-old tenant share-cropper in Sunflower County, killed his wife, Mrs. Gene West, who was 21 years of age, carried the body some distance from their residence and left it in a weed patch until he could return to the house and get a shovel to dig a hole in an attempt to conceal the crime. The body was not found until on the following Monday when he pointed out to the officers and others its whereabouts in the weed patch, covered with about six inches of earth. At the September term of court thereafter he was convicted of the crime of murder and sentenced to be electrocuted in the death chair.

The said accused was represented by counsel who were appointed by the court to defend him, and they have raised by their assignment of errors and brief a number of grounds which they contend would require a reversal of the case for a new trial.

It is first contended that the conviction of murder is against the overwhelming weight of the evidence, since the confession of the killing by the accused and all of his statements or admissions against interest in regard thereto, in the absence of other proof thereof, disclosed

that he was guilty of no greater offense than that of manslaughter. ██ ██ The issue of whether the accused was guilty of murder or manslaughter was submitted to the jury under proper instructions, and that issue is ordinarily one for the determination of the jury.

When the disappearance of Mrs. West from her home was noted, the accused claimed to one of the neighbors that on the night of Wednesday, April 16th, his wife's sister from Arkansas came to the home before midnight in an automobile in company with a man and that Mrs. West went out to the car, talked with them, and then returned into the house and got some clothing and stated to her husband that she was going with her sister. He did not at that time elaborate on this story.

On Thursday, April 17th, another neighbor, Mrs. Minnie Bell Slack, who lived 200 or 300 yards from the West home, and who doubted the truthfulness of the story as to the alleged disappearance of Mrs. West in company with her sister, went to Arkansas where she evidently reported to the family of the deceased the story of her disappearance, and with the result that on the following Sunday a peace officer in Arkansas telephoned the sheriff of Sunflower County, Mississippi, and caused him to start an investigation. A deputy sheriff went to the home of the accused on that afternoon and was told the same story by him that he had previously related to a neighbor.

On the following day this deputy together with W. W. Billings, the chief deputy sheriff, Mr. Kilburn, the father of Mrs. West, and a deputy sheriff from Mississippi County, Arkansas, went to the West home where Billings talked to the accused on the front porch and the accused then repeated his story as to his wife's disappearance and claimed that she carried with her a gold colored satin dress, a brown dress, etc., when she left home on the previous Wednesday night.

Thereupon the accused was taken into custody, carried to the town of Drew in Sunflower County, where

all of the occupants of the car got out of the same except Deputy Billings and the accused. Billings then drove out to the edge of the town, stopped the car and informed the accused that from the information that he had gained from others the accused had not told the truth as to the whereabouts of his wife and that the deputy intended to take him to Indianola to jail and then return to the West home with sufficient help to make a thorough search of the premises for the body of the deceased; thereupon the accused admitted that he had killed his wife and stated that he would go with the officer and show him where he buried her; and that a Board of Inquest was then organized and that the members thereof together with the officers assembled at the West home where the accused pointed out the place where he had buried the body some distance from the house.

At the scene where the hole had been dug and the body covered with dirt one of the officers removed the dirt and first discovered a pillow slip on top of the body, which contained a nightgown and the other clothing which met the description that the accused had previously claimed his wife carried with her when she left home on the previous Wednesday night. We pause here to comment that although it is contended on behalf of the accused that his mentality is such that he should not be executed for his alleged crime, he had sense enough to realize that some of his wife's clothing had to be missing from home if she had left on a journey or visit to her sister in Arkansas, and he, therefore, placed the clothing above described in the hole with the body when he buried it and in order that these dresses might not be later found in the house.

After removing all of the dirt from around the body, a photograph was taken of the body and the pillow slip which contained the clothing. The body was then removed from the "grave" and another photograph was taken which disclosed the brutal manner in which the

deceased had been beaten to death, and also showed two or three cut places on her stomach through which a good portion of her intestines had protruded. At first the accused claimed that these cut places were evidently made by the point of the shovel when he was burying the body. Other photographs were taken showing the scene where the body was buried and the four photographs were introduced in evidence over the objection of the defendant at the trial on the ground that they were incompetent, irrelevant and immaterial on any issue of fact in the case, and only tended to inflame the minds of the jurors and to prejudice them against the defendant to such an extent as to cause them to render a verdict which called for the infliction of the death penalty.

The introduction of these photographs is assigned as error on this appeal, and also the fact that one of the photographs together with certain testimony offered by the State, served to disclose that the accused had dug another hole near where his wife's body was buried and that this second hole was about three feet long and about twelve inches deep and caused the jury to infer that the accused had intended to return to the house and kill the little West boy who was then asleep, and who was the only other person in the home on the night of the killing, and who was left at the home of a neighbor on the next day after the disappearance of his mother.

After the taking of the photographs and the removal of the body of Mrs. West from the scene where it was found, some of the members of the Board of Inquest and the officers went to the West home, and with the expressed consent of the accused they made a search of the house and found a bloody butcher knife behind the stove and also some blood on the floor in the bedroom, which blood appeared to have been partially scrubbed up. The accused then stated in substance that instead of having made the cuts on the stomach of Mrs. West with the

shovel in burying her body, he had gotten the butcher knife when he returned to the house for the shovel and that he thus cut her body with it at the grave after her death.

Thereupon the officers carried the accused back to Drew to the office of the County Prosecuting Attorney where he made a free and voluntary confession in writing, which contained his last version of what had occurred and in which he claimed that he and his wife had had a quarrel on Tuesday afternoon in regard to having the little boy's hair cut, and then had a fight that night; that the next day the accused went to Drew, returned home at about 7:00 o'clock P. M., ate supper and that he and his wife got into another argument; that ''sometime after midnight Wednesday night after we had gone to bed, we got into another argument and got to fighting and I got her around the throat and choked her. While I was choking her I beat her in the head and face. About an hour later I realized she was dead, and about 2 or 3 o'clock Thursday morning, I took her from the bed where she was lying dead and carried her across the field about a half mile from the house, laid her down in the weed patch, and then returned to the house and got a long handle shovel and the kitchen butcher knife * * *.''

There was no attempt on the part of the accused at the trial to show that his oral and written confessions were not freely and voluntarily made. An inquiry out of the presence of the jury was made by the court in that behalf and an opportunity was offered the accused to introduce any evidence that he should desire to show that the confession was not freely and voluntarily made, but he failed to avail himself of the opportunity to do so. Nor did he take the stand as a witness in his own behalf to testify before the jury as to these or any other alleged facts in the case. Nor did he introduce any witnesses in his behalf at the trial on the merits.

It seems that during the month of September prior to the trial the defendant, together with a deputy sheriff and one of his attorneys, came to Jackson and had a licensed physician and practicing psychiatrist to examine the accused for a period of about four hours to ascertain whether or not he was sane. The psychiatrist testified as a witness for the State at the trial that the accused was mentally defective but sane; that he knew the difference between right and wrong and that he was capable of premeditation; and that although he had an I. Q. of only 65 and the mind of a person not over 11 years of age and was illiterate, the witness testified that nevertheless the accused was sane and had admitted to him that he knew it was wrong to kill anyone. That the accused stated that he believed in God and had been told by his mother about Jesus Christ and the Ten Commandments, but told the doctor that he couldn't explain his belief and the doctor testified that he knew the difference between right and wrong on the basis of what he had been told.

The psychiatrist made a written report as to his findings, which counsel for defendant had him to make an exhibit to his testimony when he was offered as a witness by the State, and the defense introduced this report as the sole evidence on behalf of the defendant.

Several lay witnesses testified that in their opinion the accused was sane, including the jailer who had had him in his custody from April to September and one or more witnesses who had been associated with the accused in the past. There was no testimony given by any witness to the effect that the defendant was insane.

■■■ We think that on the issue of criminal responsibility the jury was warranted in finding the accused to be accountable for his crime under the legal test laid down by this Court in the cases of Cunningham v. State, 56 Miss. 269; Brummett v. State (Miss.), 181 So. 323; and other cases.

We are also of the opinion that the photographs taken of the body of the deceased at the "grave" were competent for the purpose of identifying the body as being that of Mrs. Gene West for whose murder the defendant had been indicted. They were introduced as exhibits to the testimony of the officer who knew that they were photographs of the same body that was removed from the burial place pointed out to him by the accused, and they were identified as photographs of Mrs. Gene West by Mrs. Minnie Bell Slack, the nearby neighbor who knew of the disappearance of Mrs. West, but who was not shown to have seen the body when it was uncovered at the scene of the attempted concealment of the crime. These photographs were part of the proof of the corpus delicti which the State had to establish before the confessions of the accused would have been admissible in evidence. Moreover, we think that they were competent to show the state of mind of the accused and that the killing of his wife was maliciously done on the issue of whether the crime was that of murder or manslaughter. Then, too, since the bloody butcher knife was found behind the stove in the house and blood was found on the floor near the bed, the jury may have been warranted in believing that he used the knife in killing Mrs. West in the bedroom, instead of using it at the place of burial, since there was no reason on earth for his having used it at the latter place as his victim had died and had been carried nearly a half mile for burial. If the jury had believed that she was cut with the knife while she was being killed they were entitled to consider such fact on the issue of whether the accused killed her with malice aforethought or in an angry rage in the heat of passion without malice aforethought.

It is true that the undertaker had testified in a general way about part of the face of the deceased being caved in and her stomach cut open and that she died of concussion of the brain, his testimony was not as enlightening as

were the photographs in portraying the utter depravity of the accused and his state of mind in connection with the killing of his wife on the issue of murder or manslaughter. If the photographs were pertinent, material and relevant as evidence on any issue in the case, then the defendant cannot complain of the portrayal of a condition which he himself brought about. The case of Price v. State, (Miss.), 54 So. 2d 667, and the cases cited therein, expressly so held. We adhere to the rule that if photographs which disclose the gruesome aspect of a crime are not pertinent, relevant, competent or material on any issue in the case and serve the purpose solely of inflaming the minds of the jurors and prejudicing them against the accused they should not be introduced in evidence. 20 Am. Jur. 608, Sec. 729; 32 C. J. S. 611, Sec. 709. But under all of the facts and circumstances of this case we are unable to say that these photographs were not pertinent, competent and material.

 The complaint that the photographs in question tended to establish another crime—the mutilation of a dead body—and are therefore inadmissible, is not well taken for the reason that in the case of May v. State, 205 Miss. 295, 38 So. 2d 726, this Court held that such evidence is competent "to show identity, guilty knowledge, intent or motive, or where the offense charged is so interwoven with other offenses that they cannot be separated."

 It is next urged that a photograph taken of Mrs. West about two weeks before her death should not have been introduced for the consideration of the jury in connection with the gruesome appearance of the body after she was murdered. That photograph was not sent up with the record here; but, if it be conceded that its introduction was error, we are unable to see how this fact could have prejudiced the outcome of the trial since the jurors naturally knew that there was quite a contrast between the appearance of the victim prior to the time her face was caved in, both at the side of her nose and against her

brain and after she had been so brutally and remorselessly beaten and blooded by the assault made on her by the accused, as shown by the photographs taken after her death. In other words, we don't think that the prior photograph had any bearing on the case or affected the result of the trial.

As to the questions asked and the answers given during the development of the State's case in regard to the fact that there was another hole or small grave dug near that where the body of Mrs. West was buried, and only 3 feet long and 12 inches deep, a majority of the Judges are of the opinion that it was error for the State to have emphasized this fact, even though it was a part of the scene on the area of ground that was photographed; and if this were a close case on the issue of the guilt or innocence of the accused, the proof as to the second or small grave might present a very serious question in view of the fact that the State had theretofore developed the fact that the small son of the accused and the deceased were the only other persons in the home on the night of her murder. But in the instant case the fact that the accused had admittedly beaten his wife to death and had failed to offer any evidence to show the extent of his provocation, if any, for so doing, or that his oral and written confessions of his commission of the crime were not freely and voluntarily made, we are unable to see how a jury, if it believed the accused to have been sane, could have reached any other verdict than that rendered, assuming that they were in favor of capital punishment in proper cases, as they had necessarily so stated to the court on their voir dire examination as jurors in order to qualify to serve in the case.

Our attention is called to the fact that in the case of Coleman v. State, No. 38797, decided on October 12, 1953, this Court held that a photograph of the deceased taken as he lay on the ground after being killed by the appellant, was not relevant and of no value to the jury, and

should not have been admitted in evidence. Our response is that we did not reverse the Coleman case on that account, but on the stated ground that the instructions to the jury should have limited the issue to no greater offense than manslaughter.

Referring again to the testimony in regard to the small hole, or second grave, that had been dug near the larger one in which the body of Mrs. West was found, it is to be conceded that the jurors could have reasonably believed that the accused abandoned the digging of the small hole and selected the nearby place where the excavation could be more easily done for the burial of Mrs. West.

Rule 11, adopted by this Court for application in a proper case, reads as follows: *"No Reversal for Harmless Error.* No judgment shall be reversed on the ground of misdirection to the jury, or the improper admission or exclusion of evidence, or for error as to the matter of pleading or procedure, unless it shall affirmatively appear, from the whole record, that such judgment has resulted in a miscarriage of justice."

We are unable to say that there has been any miscarriage of justice in the instant case, and we are, therefore, of the opinion that the judgment and sentence of the trial court should be affirmed.

Affirmed, and Thursday, December 3, 1953, is fixed as the date for the execution of the death sentence.

All Judges concur except *Hall, J.,* who took no part in the decision of this case.