766 So.2d 795 (2000)
Larry JACKSON, Appellant,
v.
STATE of Mississippi, Appellee.
No. 1999-KA-00441-COA.
Court of Appeals of Mississippi.
August 29, 2000.
*798 Thomas H. Pearson, Clarksdale, Attorney for Appellant.
Office of the Attorney General by Charles W. Maris Jr., Attorney for Appellee.
BEFORE McMILLIN, C.J., LEE, AND MOORE, JJ.
MOORE, J., for the Court:
¶ 1. Larry Jackson was indicted for capital murder. After a jury trial in the Quitman County Circuit Court, Jackson was adjudged guilty and given a life sentence in the custody and control of the Mississippi Department of Corrections. Aggrieved, Jackson appeals his conviction citing the following errors which we quote verbatim
I. THE COURT ERRED IN REFUSING DEFENDANT'S JURY INSTRUCTIONS THEREBY FAILING TO FULLY INSTRUCT THE JURY CONCERNING THE LAW ON THIS MATTER, THEREBY DENYING THE DEFENDANT A FAIR TRIAL;
II. THE COURT ERRED IN REFUSING DEFENDANT'S JURY INSTRUCTIONS ON THE MATTER OF LOST EVIDENCE AND THEREBY FAILING TO FULLY INSTRUCT THE JURY CONCERNING THE LAW ON THIS MATTER, THEREBY DENYING THE DEFENDANT A NEW TRIAL;
III. THE COURT ERRED IN SEVERAL MATTERS WITH REFERENCE TO THE TESTIMONY OF CAPTAIN BILL ELLIS. THE FIRST WAS ALLOWING CAPTAIN BILL ELLIS TO EXPRESS HIS PERSONAL *799 DESIRES IN THIS CASE; SECOND, WAS ALLOWING CAPTAIN BILL ELLIS TO TESTIFY AS TO "NORMAL PROCEDURES"; THIRD, ALLOWING CAPTAIN BILL ELLIS TO TESTIFY AS TO HIS INTENT IN PREPARING A VICAP; AND FOURTH, THE COURT REFUSED TO ALLOW THE DEFENSE COUNSEL TO CROSS EXAMINE CAPTAIN BILL ELLIS ON SHAWN JONES' STATEMENT, THEREBY DENYING DEFENDANT A FAIR TRIAL;
IV. THE COURT ERRED IN ALLOWING SHERIFF HARRISON TO EXPRESS HIS OPINION AS TO WHY THE PANTS POCKETS OF THE DECEDENT'S PANTS WERE TURNED INSIDE OUT, THEREBY DENYING THE DEFENDANT A FAIR TRIAL;
V. THE COURT ERRED IN REFUSING TO ALLOW JACKSON'S ATTORNEY TO CROSS EXAMINE HARRISON ABOUT JACKSON'S JULY 9, 1997 STATEMENT WHILE ALLOWING THE STATE TO EXAMINE HARRISON ABOUT JACKSON'S JULY 9, 1997 STATEMENT, THEREBY DENYING THE DEFENDANT A NEW TRIAL;
VI. THE COURT ERRED IN ADMITTING GRUESOME AND INFLAMMATORY PHOTOGRAPHS WHICH WERE MORE PREJUDICIAL THAN PROBATIVE, THEREBY DENYING THE DEFENDANT A FAIR TRIAL;
VII. THE COURT ERRED IN REFUSING TO ALLOW THE DEFENSE TO CALL COLON VAUGHN AND HERMANDER CLARK TO THE WITNESS STAND, THEREBY DENYING THE DEFENDANT A FAIR TRIAL;
VIII. THE COURT ERRED IN ALLOWING THE TESTIMONY THAT SHAWN JONES WAS UNABLE TO HEAR THAT WHICH HE CLAIMED TO HAVE HEARD, THEREBY DENYING THE DEFENDANT A FAIR TRIAL;
IX. THE COURT ERRED IN ALLOWING MATTIE REED TO TESTIFY ABOUT A STATEMENT TO SHERIFF HARRISON, THEREBY DENYING THE DEFENDANT A FAIR TRIAL; AND
X. THE VERDICT OF THE JURY IS NOT ONLY AGAINST THE OVER-WHELMING WEIGHT OF THE EVIDENCE, BUT IT IS EVIDENCE OF BIAS AND OR PREJUDICE ON BEHALF OF THE JURY. FURTHER, THE COURT ERRED IN NOT GRANTING A JUDGMENT OF "NOT GUILTY" NOT WITHSTANDING THE VERDICT OF THE JURY.
Finding no error, we affirm.

FACTS
¶ 2. On June 21, 1993, eighty-one year old Andy Watson was brutally murdered at his home on Oasis Road in Lambert, Mississippi. After a lengthy investigation by law enforcement officers, Larry Jackson ("Jackson") and his brother Nick Jackson were indicted for murder during the commission of a robbery, a capital offense. The cases were severed, and Larry Jackson was tried on September 21, 1998.
¶ 3. Trial testimony revealed that Mr. Watson sustained thirty-five stab, slash, and chop wounds that were most likely administered with a butcher knife. He was found lying face-down in a pool of blood with one of his back pants pockets turned inside-out. The murder weapon was never recovered.
¶ 4. At the time of the murder, Jackson lived with his girlfriend Mattie Reed in a house belonging to Reed's mother, Mattie Carpenter. Carpenter's other daughter, Rhonda Carpenter, also lived in her mother's house. On the day following the murder, Rhonda and her boyfriend, Daniel Faulkner, also a resident of Mattie Carpenter's house, took some trash to the garbage can located outside. Rhonda and Daniel both testified that they saw some *800 bloody clothes, a man's shirt and pants, in the garbage can. They transported the clothes to the police station in Lambert which was located at the Lambert mayor's office. At some point, the bloody clothes were lost.
¶ 5. The day of the murder, Jackson and Nick left Carpenter's house at around noon and were gone until late that evening. When they returned, Jackson parked his car behind the house contrary to his usual routine of parking in the front. When Jackson left the house he was wearing pants and a shirt and when he returned he was wearing the thick, heavy coveralls that he customarily carried in the trunk of his automobile. Nick was wearing pants and a shirt which were bloodstained. Nick changed into some clothes which he borrowed from Jackson. At some point, Carpenter and Rhonda noticed that a butcher knife was missing from the household.
¶ 6. Reed wanted to borrow Jackson's car on the day following the murder to drive to the store for some cigarettes. She observed blood on the floorboard of the driver's side of the car and decided to walk to the store instead. Jackson departed in the car. When he returned, with brother Nick in tow, Jackson's car sported new carpet. Jackson and Nick, laden with liquor and beer, initiated a party at the Carpenter household. When asked where he acquired the money for the liquor and beer, Jackson told Reed that he and Nick "took care of" an old man on Oasis Road. Overhearing this remark, Nick admonished his brother to "shut up" before he got them into trouble. Rhonda overheard Jackson tell Reed that they had "went out and did that sucker in." Rhonda also overheard Nick tell Jackson: "Man, you need to hush your mouth. You're talking too much." A couple of days later, Reed overheard Nick tell Jackson that he, Nick, and some man were wrestling and that it took awhile for Nick to wear the man down.

LAW AND ANALYSIS

I. DID THE COURT ERR IN REFUSING DEFENDANT'S JURY INSTRUCTIONS?
¶ 7. Under this assignment, Jackson complains particularly that the trial court erred in not giving the aiding and abetting instruction which he requested. A review of the record reveals that the aiding and abetting instruction to which Jackson refers is D-2. Jackson complains that "the jury was entitled to a jury instruction of this law and they did not receive it." This is a novel argument considering that: (1) the trial court gave S-7 which was patterned after the aiding and abetting instruction approved by the Mississippi Supreme Court in Carr v. State, 655 So.2d 824, 833 (Miss.1995); and (2) the only reason Jackson requested an aiding and abetting instruction is because "[t]hey're [the State] the ones who brought up aiding and abetting." In fact, Jackson offered to withdraw D-2 if the State would withdraw its aiding and abetting instruction.
¶ 8. "The trial court enjoys considerable discretion regarding the form and substance of jury instructions." Higgins v. State, 725 So.2d 220 (¶ 15) (Miss.1998) (citing Splain v. Hines, 609 So.2d 1234, 1239 (Miss.1992)). The trial court may refuse an instruction which is fairly covered elsewhere in the instructions. Id. at (¶ 16). Since the law of aiding and abetting was fully and fairly covered in S-7, the trial court did not err in refusing D-2.

II. DID THE COURT ERR IN REFUSING DEFENDANT'S JURY INSTRUCTIONS ON THE MATTER OF LOST EVIDENCE?
¶ 9. A review of the record reveals that Jackson requested one instruction, D-6, on lost evidence which is as follows:
The Court instructs the jury that if you determine by a preponderance of the evidence the State caused the bloody pants and shirt to become either destroyed, misplaced, or unavailable then *801 the jury may infer that such bloody pants and shirt would be unfavorable to such party, determined to be the party responsible and the jury may give to such evidence whatever weight, worth and credibility the jury determines it is entitled.
Jackson did not support D-6 with law, and he did not state the grounds for his objection to the trial court's denial of D-6 during the instruction conference. The State objected to the "preponderance of the evidence" language and argued that it had sufficiently explained the absence of the bloody clothes through Sheriff Harrison's testimony. Further, the State argues on appeal that D-6 is not a correct statement of the law of spoliation of evidence in a criminal case.
¶ 10. "The State's duty to preserve evidence is `limited to evidence that might be expected to play a significant role in the suspect's defense.'" Tolbert v. State, 511 So.2d 1368, 1372 (Miss.1987) (quoting California v. Trombetta, 467 U.S. 479, 489, 104 S.Ct. 2528, 81 L.Ed.2d 413 (1984)). To play a significant role, "the exculpatory nature and value of the evidence must have been (1) apparent before the evidence was destroyed and (2) of such a nature that the defendant could not obtain comparable evidence by other reasonable means." Id. This constitutional materiality standard is not satisfied by the "mere possibility" that the evidence will help the defense. Id. (citing United States v. Binker, 795 F.2d 1218, 1230 (5th Cir. 1986)). Jackson argues that the clothes are "important." However, he does not argue that they would have been exculpatory. There is no question that comparable evidence could not be procured in this case. However, no effort has been made to point out whether the exculpatory nature of the bloody clothes was apparent before they were lost. That evidence is "important" is not sufficient to fulfill the constitutional materiality standard.
¶ 11. To determine whether the accused's due process rights have been violated by the destruction of evidence, we must consider whether "the government agents had acted in good faith and in accord with their normal practice or had made a conscious effort to suppress exculpatory evidence." Id. (citing Trombetta, 467 U.S. at 488, 104 S.Ct. 2528). Further:
It is a general rule that the intentional spoliation or destruction of evidence relevant to a case raises a presumption, or, more properly, an inference, that this evidence would have been unfavorable to the case of the spoliator. Such a presumption or inference arises, however, only where the spoliation or destruction was intentional and indicates fraud and a desire to suppress the truth, and it does not arise where the destruction was a matter of routine with no fraudulent intent.
Id. at 1372-73 (quoting Washington v. State, 478 So.2d 1028, 1032-33 (Miss. 1985)).
¶ 12. Jackson argues that "the jury certainly has a right to know that if evidence is not produced, then it is inferred that the evidence would be prejudicial to the party not producing it." (emphasis added). However, for the inference or presumption of prejudice to arise, prosecutorial bad faith must be present according to Trombetta and its progeny. More specifically, the spoliation of the evidence must have been intentional and must have indicated fraud and a desire to suppress the truth. While Jackson questioned why the bloody clothes came up missing, he did not suggest that the law enforcement officers deliberately suppressed the evidence. Quitman County Sheriff Harrison testified that Rhonda and Faulkner took the bloody clothes to the Lambert Police Department. Harrison did not know about the clothes until approximately two years after the murder when he took statements from Rhonda. Harrison asked Henry Gibson, who was the chief of the Lambert Police Department at the time, if he knew about the clothes. Gibson vaguely remembered *802 a bag of bloody clothes but did not know what became of them.
¶ 13. While losing a bag of bloody clothes is no doubt sloppy on the Lambert Police Department's part, there is no indication that the disappearance of the evidence was a deliberate attempt to suppress the truth. If we were to take Jackson's argument to its logical conclusion, not only would Jackson be entitled to D-6 pertaining to the bloody clothes being destroyed or lost by the law enforcement authorities, but the State would be entitled to a comparable instruction regarding Jackson's deliberate destruction of the bloody carpeting in his car. In other words, if Jackson is entitled to an instruction that the jury can infer that the bloody clothes would have been unfavorable to the State, so also would the State be entitled to an instruction that the jury can infer that the bloody carpeting in Jackson's car would have been unfavorable to Jackson. This assignment of error is without merit.

III. DID THE COURT ERR IN SEVERAL MATTERS WITH REFERENCE TO THE TESTIMONY OF CAPTAIN BILL ELLIS?
¶ 14. Jackson specifically complains that the trial court erred: (1) by allowing Captain Bill Ellis to express his personal desires in this case; (2) by allowing Captain Ellis to testify as to "normal procedures"; (3) by allowing Captain Ellis to testify as to his intent in preparing a VICAP; and (4) by refusing to allow the defense counsel to cross-examine Captain Ellis on Shawn Jones's statement. Jackson supports this fourfold assignment of error by citation to one case, Killingsworth v. State, 374 So.2d 221 (Miss.1979), in which the court states: "Incompetent evidence, inflammatory in character, when presented to a jury carries with it a presumption that it was harmful." Id. at 224 (citing McDonald v. State, 285 So.2d 177, 179 (Miss.1973)). Jackson generally argues that the above testimony was irrelevant and prejudicial.[1] He does not specify how the evidence prejudiced him, and he does not specify how his complaints about Captain Ellis's testimony were "inflammatory in character." In short, Jackson has failed to support this assignment of error, and we are not obliged to consider the same.
¶ 15. Given the gravity of the crime for which Jackson was convicted, we will briefly address the portions of Captain Ellis's testimony about which Jackson complains, keeping in mind that it is difficult to address his alleged errors without a more articulate exposition of the alleged trial court error. As a beginning point we note:
Relevancy and admissibility of evidence are largely within the discretion of the trial court, and reversal may be had only where that discretion has been abused. Furthermore, the trial court's discretion must be exercised within the scope of the Mississippi Rules of Evidence, and reversal will be appropriate only when an abuse of discretion resulting in prejudice to the accused occurs.
White v. State, 742 So.2d 1126 (¶ 29) (Miss. 1999) (citing Parker v. State, 606 So.2d 1132, 1137-38 (Miss.1992)).
¶ 16. First, we address Captain Ellis's "personal desires in this case." Captain Ellis, who was a field investigator for the Mississippi Highway Patrol at the time of the murder, testified that he "was really wanting to see this case go somewhere." He said this when explaining why he turned his case file over to another officer upon leaving his job as an investigator. The trial court initially sustained Jackson's objection to this testimony, but later overruled the objection. The trial court asked: "What's wrong with having an investigator of the case having an interest in seeing that there was follow-up work, after he had left the position [as investigator of the crime]?" Captain Ellis's testimony in this regard was relevant to explain why he did *803 not follow through on the events leading to Jackson's arrest. Even had this testimony not been relevant we, like the learned trial judge, are at a loss as to how this testimony prejudiced Jackson. The trial court did not abuse its discretion by allowing this testimony.
¶ 17. Jackson next complains that the trial court allowed Captain Ellis to testify to "normal procedures" in other cases. From a review of the record we are able to surmise that the testimony to which Jackson refers is Captain Ellis's testimony that he would normally secure a crime scene to protect prints in blood and fingerprints. The State elicited this testimony on redirect in response to Jackson's cross-examination questions regarding the absence of this type of evidence in the present case. Captain Ellis explained that he normally collected this type of evidence upon securing the crime scene, but when he arrived to investigate Watson's murder the crime scene had been contaminated by others present. This was proper redirect. Again, Jackson failed to articulate how this testimony prejudiced him, and we find no abuse of discretion.
¶ 18. Jackson next complains that the trial court allowed Captain Ellis to testify regarding his intent in preparing a VICAP. A VICAP is a report submitted to the behavioral science unit of the FBI for the purpose of developing a suspect profile on unsolved cases. Jackson initiated questioning regarding the VICAP during his cross-examination of Captain Ellis. Jackson specifically questioned Captain Ellis about his notation in the VICAP that the victim suffered minimal blunt-force trauma. On redirect, Captain Ellis was allowed to explain, over Jackson's objection, that he did not intend to supplant information contained in the autopsy report with information he reported in the VICAP. Captain Ellis noted that he attached a copy of the autopsy report to the VICAP. The State's question was in direct response to an issue raised in Jackson's cross-examination; thus, it was proper redirect. Without a clearer articulation of why allowing this testimony was error we cannot say the trial court abused its discretion.
¶ 19. Finally, Jackson argues that he was not allowed to cross-examine Captain Ellis regarding a statement of Shawn Jones. This alleged error is without merit because it is not true. The record reveals that Jackson initiated the discussion of Jones's statement, over the State's objection, during his cross-examination of Captain Ellis. On redirect the State questioned Captain Ellis further about Jones's statement without an objection by Jackson. Jackson attempted no further questions when the State completed its redirect examination.

IV. DID THE COURT ERR IN ALLOWING SHERIFF HARRISON TO EXPRESS HIS OPINION AS TO WHY THE PANTS POCKETS OF THE DECEDENT'S PANTS WERE TURNED INSIDE OUT?
¶ 20. Sheriff Harrison testified that he had investigated crimes in the past concerning robberies that involved pockets being turned inside out. He opined that a turned out pocket indicates that something has been removed from that pocket, and in a man's case it would normally be a wallet. Jackson objected to this testimony at trial and on appeal argues that police officers cannot give opinions as to ultimate issues of fact which the jury can decide for themselves. He further complains on appeal that Sheriff Harrison was never qualified as an expert at trial.
¶ 21. Sheriff Harrison was not listed as an expert in discovery, and he was not tendered as an expert by the State at trial. However, the trial court implicitly accepted him as an expert because his testimony was "[b]ased on the Sheriffs past experience and familiarity with robberies...." At trial, Jackson did not object to Sheriff Harrison testifying as an expert without having been tendered as such. Nor did Jackson object that the *804 State violated discovery rules by not notifying him that Sheriff Harrison would give expert testimony. Jackson's objection was that "Sheriff Harrison was offering [an] expert opinion about a matter of that nature. I think the jury is competent to form their own opinions about why his pocket might be turned inside out." Jackson's objection seems to acknowledge that Sheriff Harrison was an expert; he simply complained that Harrison was testifying outside the realm of his competency. Now, for the first time on appeal, Jackson complains that Sheriff Harrison was never qualified as an expert.
¶ 22. Had Jackson objected at trial to Sheriff Harrison's testifying as an expert without being named an expert in discovery or without having been qualified as an expert at trial, the trial judge would have had an opportunity to rectify the situation. This identical situation arose in a case we recently decided, Harrison v. State, 1998-KA-01278-COA, ___ So.2d ___, 2000 WL 137445 (Miss.Ct.App. Feb. 8, 2000). In Harrison, a police officer was allowed to testify that the quantity of drugs found on the defendant was too large for personal consumption. The officer had not been listed as an expert in discovery, and he was not qualified as an expert at trial. At trial the defendant objected to this testimony because it went beyond the experience and training of the officer.
¶ 23. On appeal, the defendant argued that the officer's testimony was expert testimony and that he was not qualified as an expert at trial. We acknowledged that the testimony was expert testimony. We refused, however, to reverse "based on an appellate objection that was not presented at trial." Id. at (¶ 44), (citing Oates v. State, 421 So.2d 1025, 1030 (Miss.1982)). Further we held: "The reason for that rule is well exemplified here. Though qualifying an expert is an important procedural requirement, it is probable that following the requirements here would have led to this witness being accepted as an expert. It is too late to point out the oversight now." Id.
¶ 24. In the case sub judice, Jackson's objection at trial, like the objection in Harrison, was inadequate. Like Harrison:
The possibility that a discovery violation had occurred regarding an expert witness simply was not raised. Had it been, a recess for examining the officer and then a decision reached on whether a continuance was needed might have occurred. If the issue raised at trial had been that the officer would need to be offered and qualified as an expert, that also could have been attempted by the State. Neither specific objection was made and therefore neither specific remedy was applied.
Id. at (¶ 46).
¶ 25. Further, Jackson's argument that Sheriff Harrison could not testify as to an "ultimate issue" to be decided by the jury is erroneous. M.R.E. 704 states: "Testimony in the form of an opinion or inference otherwise admissible is not objectionable because it embraces an ultimate issue to be decided by the trier of fact." This assignment of error is without merit.

V. DID THE COURT ERR IN REFUSING TO ALLOW JACKSON'S ATTORNEY TO CROSS EXAMINE HARRISON ABOUT JACKSON'S JULY 9, 1997 STATEMENT WHILE ALLOWING THE STATE TO EXAMINE HARRISON ABOUT JACKSON'S JULY 9, 1997 STATEMENT?
¶ 26. Jackson gave a statement to the law enforcement authorities in which he denied involvement in the crime. For the first time on cross-examination, Jackson's attorney attempted to question Sheriff Harrison about the statement. The trial court would not allow Jackson to question Sheriff Harrison regarding what Jackson said in the statement; however, Jackson managed to elicit testimony from Sheriff Harrison that Jackson denied involvement in the crime. On redirect, the State asked *805 Sheriff Harrison if Jackson's statement contained any information indicating that he had knowledge of the facts involved in this crime. While the trial court overruled Jackson's objection to this question, Sheriff Harrison never answered the question, and the State asked no further questions about Jackson's statement.
¶ 27. Jackson's assertion that the State was allowed to examine Sheriff Harrison about the statement but denied Jackson the same opportunity is misleading. Neither party was allowed to elicit information regarding what Jackson said in the statement. Jackson raised the issue for the first time on cross-examination, and the State, after Jackson's objection, abandoned its attempt to question Sheriff Harrison regarding the statement. Also misleading is Jackson's reliance on Banks v. State, 631 So.2d 748 (Miss.1994). In Banks, the court reversed a conviction where the defendant was not allowed to cross-examine an officer on his entire statement after the State examined the officer on inculpatory parts of his statement. The court, quoting Davis v. State, 230 Miss. 183, 188, 92 So.2d 359, 361 (1957), stated:
It is an elementary rule of law that when admissions of one on trial for the commission of a criminal offense are allowed in evidence against him, all that he said in that connection must be permitted to go to the jury either through the cross-examination of the witness who testified to the admission or through witnesses produced by the accused. Moreover, the fact the declarations were made by the accused were self serving does not preclude their introduction in evidence as part of his whole statement, if they are relevant to statements introduced by the state and were made on the same occasion as the statements introduced by the state.
Banks, 631 So.2d at 750.
¶ 28. In the case sub judice the State did not elicit any admissions or inculpatory information regarding Jackson's statement. Jackson's attempt to admit his self-serving statement was not relevant to statements introduced by the State; thus, Jackson's reliance on Banks is misplaced.
¶ 29. In Clanton v. State, 539 So.2d 1024 (Miss.1989), a rape defendant attempted to introduce two statements he gave to law enforcement officers in which he claimed that the sexual intercourse was consensual. Like Jackson in the present case, Clanton did not testify at trial. The court stated: "Clearly, hearsay statements such as these are inadmissible when there has been no testimony of any kind offered to support them." Id. at 1028 (citing United States v. Quinto, 582 F.2d 224, 232-34 (2nd Cir. 1978)). The court further stated that Clanton had no right to use his statements to bolster his defense, "most especially ... since Clanton did not testify himself, and there is no testimony in the record before the jury that Carpenter [the victim] consented to this sexual activity." Id. In the case sub judice, Jackson sought to use his hearsay statement purely to bolster his defense. We find no error in the trial court's refusal to allow Jackson to testify, without being subject to cross-examination, through his self-serving statement.

VI. DID THE COURT ERR IN ADMITTING GRUESOME AND INFLAMMATORY PHOTOGRAPHS WHICH WERE MORE PREJUDICIAL THAN PROBATIVE?
¶ 30. Jackson complains about several photographs of the deceased being introduced into evidence. Understandably, photographs depicting a victim who has suffered thirty-five stab, slash, and chop wounds are gruesome. Jackson argues that under West v. State, 218 Miss. 397, 67 So.2d 366 (1953), evidence with little probative value should be excluded if "offered for the principal purpose of arousing prejudicial emotions...." However, Jackson completely failed to support his argument that the photographs had little probative value.
¶ 31. "Photographs have evidentiary value where they: 1) aid in describing *806 the circumstances of the killing and the corpus delicti; 2) where they describe the location of the body and cause of death; and 3) where they supplement or clarify witness testimony." Westbrook v. State, 658 So.2d 847, 849 (Miss.1995) (citations omitted). Whether to admit photographs is a decision which rests within the trial court's discretion and is a decision that we will not disturb absent an abuse of discretion. Id. In Westbrook, the supreme court affirmed the admission of photographs of the victims, finding that the photographs identified the victims, showed the gunshot wound's effect on the deceased, and corroborated testimony of the physician who performed the autopsies on the murder victims. Id. at 849-50.
¶ 32. In the case sub judice, the photographs were introduced through the testimony of Sheriff Harrison. They corroborate his testimony as to the appearance of the victim. They also corroborate the testimony of Dr. Steven Hayne, the forensic pathologist who performed the autopsy on Watson. Further, the photographs identify the victim and show the effect of the wounds inflicted upon him. The photographs depicted the wounds inflicted upon different parts of Watson's body. Given that Jackson failed to support his argument that the photographs were more prejudicial than probative, we find that the trial court did not abuse his discretion by allowing introduction of the same.

VII. DID THE COURT ERR IN REFUSING TO ALLOW THE DEFENSE TO CALL COLON VAUGHN AND HERMANDER CLARK TO THE WITNESS STAND?
¶ 33. Jackson proposed to call Colon Vaughn as a witness to substantiate his claim that Vaughn murdered Watson. Jackson's attorney admitted: "He [Vaughn] has told me that he doesn't know anything about the killing, that he did not commit the killing, and that he did not make any statements that he did commit the killing." Jackson argued that he was prepared to call Hermander Clark to testify that Vaughn told her that he killed Watson. In other words, Jackson wished to impeach his own witness, Vaughn, by introducing a hearsay statement attributed to him through Clark.
¶ 34. "[B]efore a party will be authorized to introduce for impeachment purposes an unsworn pretrial inconsistent statement of his own witness, it will be necessary that he show surprise or unexpected hostility, and that such statement can never be used as substantive evidence." Wilkins v. State, 603 So.2d 309, 322 (Miss.1992). Jackson knew that Vaughn would deny the killing; therefore, he could not demonstrate surprise or unexpected hostility. Jackson's sole reason for calling Clark to testify was so he could impeach Vaughn with unsworn, hearsay statements he presumably made to Clark. This attempt is forbidden by Mississippi law; therefore, the trial court did not err in rejecting such testimony.

VIII. DID THE COURT ERR IN ALLOWING THE TESTIMONY THAT SHAWN JONES WAS UNABLE TO HEAR THAT WHICH HE CLAIMED TO HAVE HEARD?
¶ 35. Jackson initiated questioning regarding a statement that Shawn Jones gave to Sheriff Harrison. Jones was not a witness at trial, but the trial court allowed Jackson to elicit information regarding Jones's statement over the State's hearsay objection. Particularly, Sheriff Harrison testified that Jones claimed that he heard three people in the victim's house on the day of the murder and saw a blue car parked outside. On redirect, Sheriff Harrison testified that he and other law enforcement officers determined that Jones could not have heard any conversation inside the house from the location in which Jones reported he was standing.
¶ 36. Jackson's argument under this assignment of error is woefully inadequate and unsupported by authority. *807 He generally argues the trial court erred in allowing Sheriff Harrison's "inappropriate comment on the evidence" and refers us to his argument under his third assignment of error in support. However, the only case Jackson cited under his third assignment of error states generally that incompetent evidence carries a strong presumption of harmfulness. Killingsworth v. State, 374 So.2d 221, 224 (Miss.1979). He did not refer this Court to any authority to support his argument that Sheriff Harrison's testimony was incompetent or erroneous. As we have held numerous times, we are not obligated to consider unsupported assignments of error. Taylor v. State, 754 So.2d 598 (¶ 12) (Miss.Ct.App. 2000). It is the appellant's duty "to overcome the presumption of the correctness of the trial court's judgment by demonstrating some reversible error." Edlin v. State, 533 So.2d 403, 409-10 (Miss.1988).
¶ 37. Notwithstanding the procedural bar, this assignment of error is without merit. Jackson asked numerous questions regarding Jones's statement. In doing so, Jackson opened the door for questions on redirect regarding the statement. Cavett v. State, 717 So.2d 722 (¶ 22) (Miss.1998). The Mississippi Supreme Court has held:
The trial court has broad discretion in allowing or disallowing redirect examination of witnesses. When "`the defense attorney inquires into a subject on cross-examination of the State's witnesses, the prosecutor on rebuttal is unquestionably entitled to elaborate on the matter.'" ... Because these matters were all "`brought out on cross-examination,'" we find the trial court did not abuse its discretion in allowing redirect examination on the matters.
Id. (quoting De La Beckwith v. State, 707 So.2d 547 (Miss.1997)) (internal citations omitted). Since Jackson elicited testimony that Jones gave a statement in which he claimed to have heard three people in Watson's house, the State was entitled to elaborate through Sheriff Harrison's testimony that Jones could not have heard conversation from inside the house from where he claimed he was standing. As in Cavett, the trial court allowed Jackson to re-cross Sheriff Harrison after the State's redirect. The trial court did not abuse its discretion in allowing this testimony.

IX. DID THE COURT ERR IN ALLOWING MATTIE REED TO TESTIFY ABOUT A STATEMENT TO SHERIFF HARRISON?
¶ 38. Mattie Reed testified on direct that she heard Jackson's brother Nick say: "Shut up, man, you['re] talking too much, you know, you['re] running off at the mouth.... You['re] gonna [sic] get us in trouble." Jackson did not object to this testimony. On cross-examination, Jackson questioned Reed regarding an unsworn statement she gave to Sheriff Harrison on December 23, 1996, in which she stated that Nick had borrowed Jackson's car on the afternoon and night of the murder and returned the car the following morning. In her first statement, Reed told the sheriff that the car was blue and white. Reed told the sheriff that Nick committed the murder and that Jackson knew about it but did not participate in the crime himself. She did not tell the sheriff about the conversation that she overheard between Jackson and Nick. This statement was inconsistent with her trial testimony.
¶ 39. On redirect, the State asked Reed about a second, sworn statement that she gave to Sheriff Harrison in which she told him about the conversation she overheard between Jackson and Nick. She also told the sheriff that Jackson's car was brown. Jackson objected "to conversations she [Reed] had with Sheriff Harrison." The trial court overruled Jackson's objection and allowed Reed to testify regarding her second statement. Reed testified that when she gave her first statement, she had gotten into trouble and she was afraid for herself. Her second statement was consistent with her trial testimony.
*808 ¶ 40. For the first time on appeal, Jackson complains that Nick's statement to Jackson, which was elicited through Reed's testimony, is hearsay. Of course, "[u]nless timely and specific objection is made to allegedly improper testimony, the objection is deemed waived and may not be raised on appeal." Hall v. State, 691 So.2d 415, 418 (Miss.1997). Jackson's objection was to Reed's testifying to what she told Sheriff Harrison in her second statement, not to Nick's conversation with Jackson. Jackson, therefore, waived his objection to Nick's statement. Further, since Jackson questioned Reed regarding her first statement to the sheriff, the State was allowed to elaborate on redirect. It did so by questioning Reed regarding her second statement. By questioning Reed regarding her first statement, Jackson elicited information that was inconsistent with Reed's trial testimony. The State is allowed to elicit a prior consistent statement from its witness to rebut Jackson's implied charge of recent fabrication. M.R.E. 801(d)(1)(B). Again, Jackson opened the door to this testimony, and the trial judge did not abuse his discretion in allowing Reed to so testify. Cavett, 717 So.2d at (¶ 22).

X. WAS THE VERDICT AGAINST THE OVERWHELMING WEIGHT OF THE EVIDENCE AND EVIDENCE OF BIAS AND OR PREJUDICE ON BEHALF OF THE JURY? FURTHER, DID THE COURT ERR IN NOT GRANTING A JUDGMENT OF "NOT GUILTY" NOT WITHSTANDING THE VERDICT OF THE JURY?
¶ 41. Jackson correctly points out the different standards the trial court must apply in deciding motions for JNOV and new trial motions. In the main body of his argument, however, Jackson seems to have abandoned his argument in support of his motion for JNOV and argues solely that he is entitled to a new trial. In an abundance of caution, we address both.
¶ 42. In determining whether the trial court erred in failing to grant a JNOV motion, all credible evidence consistent with Jackson's guilt must be accepted as true and the State must be given the benefit of all favorable inferences that may be reasonably drawn from the evidence. McClain v. State, 625 So.2d 774, 781 (Miss. 1993). "We may reverse only where, with respect to one or more of the elements of the offense charged, the evidence so considered is such that reasonable and fairminded jurors could only find the accused not guilty." Wetz v. State, 503 So.2d 803, 808 (Miss.1987).
¶ 43. The credible evidence consistent with Jackson's guilt is as follows: Reed's testimony that Jackson replaced the blood stained carpeting from his car the day following the murder; testimony that Jackson left the house wearing a shirt and pants and returned wearing heavy coveralls; Rhonda's testimony that she overheard Jackson tell Reed that he "did that sucker in"; Reed's testimony that Jackson told her that he and Nick "took care of that old man; testimony that on the day following the murder, Jackson had money for beer and liquor; testimony from several witnesses that a butcher knife was missing from Carpenter's household; and testimony that Jackson parked his car behind the house on the night of the crime. Giving the State all reasonable inferences that may be drawn from this abundant evidence, we cannot say that the evidence is such that a reasonable jury could only find Jackson not guilty.
¶ 44. The trial court should grant a new trial motion only when the verdict is so contrary to the overwhelming weight of the evidence that to allow it to stand would be to sanction an unconscionable injustice. Wetz, 503 So.2d at 812. In reviewing the trial court's denial of a new trial motion, we must accept as true all evidence favorable to the State, and we may not reverse absent an abuse of discretion. McClain, 625 So.2d at 781. Accepting all of the evidence discussed in the preceding paragraph as true, we cannot *809 say that the trial court abused its discretion in denying the new trial motion.
¶ 45. JUDGMENT OF THE QUITMAN COUNTY CIRCUIT COURT OF CONVICTION OF CAPITAL MURDER AND SENTENCE OF LIFE IMPRISONMENT WITHOUT BENEFIT OF PAROLE TO BE SERVED IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS IS AFFIRMED. SENTENCE TO RUN CONSECUTIVE TO ANY AND ALL PREVIOUS SENTENCES. COSTS OF THE APPEAL ARE ASSESSED TO QUITMAN COUNTY.
McMILLIN, C.J., KING AND SOUTHWICK, P.JJ., BRIDGES, IRVING, LEE, MYERS, PAYNE, AND THOMAS, JJ., CONCUR.
NOTES
[1] Jackson's argument under this assignment of error occupies nine lines in his entire brief.