KING, C.J.,
for the Court.
¶ 1. Krystal Marie Teston was convicted in the Circuit Court of Harrison County of three counts of driving under the influence and negligently causing death to another and one count of driving under the influence and negligently causing serious injury to another. Teston was sentenced to serve consecutive terms of fifteen years on each count, for a total of sixty years, with thirty years suspended and five years of post-release supervision, in the custody of the Mississippi Department of Corrections *983 (MDOC). On appeal, Teston raises nine issues, which are as follows:
I. Whether the trial court erred by allowing the State to proceed to trial on Counts V, VI, VII, and VIII of the indictment.
II. Whether the trial court erred by denying Teston’s motion to suppress her blood test results when Testoris blood was drawn more than two hours after the accident.
III. Whether the trial court erred by allowing the State’s expert to testify and give his opinion regarding Testoris level of impairment at the time of the accident.
IV. Whether the trial court erred by denying Testoris motion for a JNOV or, in the alternative, for a new trial.
V. Whether the trial court erred by refusing to allow Teston’s recorded statement into evidence and by prohibiting defense counsel from questioning Officer Wesley Brantley about the recorded statement.
VI. Whether the trial court erred by reversing its ruling on Teston’s motion in limine and allowing the State to introduce evidence of Testoris arrest for driving with a suspended license.
VII. Whether the State made improper statements regarding Testoris failure to testify.
VIII. Whether the trial court erred by denying Testoris circumstantial-evidence instruction.
IX. Whether Testoris sentence was grossly disproportionate to the crime.
Finding no error, we affirm.
FACTS AND PROCEDURAL HISTORY
¶ 2. On September 10, 2004, five college students in an SUV were traveling east on Interstate 10 in Biloxi, Mississippi. The driver of a black Honda, who was later identified as Teston, was also traveling east on 1-10. The driver of the black Honda swerved into the path of the SUV. When the black Honda veered in front of the SUV, the driver of the SUV lost control of the vehicle, which crashed into the concrete median and flipped over.
¶ 3. Three of the passengers — Lindsay Miller, Maksim Sisoev, and Beth Finch— were killed in the accident. Joshua Miller, the fourth passenger, was severely injured, and Nicole Thurman, the fifth passenger, received minor injuries.
¶ 4. Stacey Ross testified that on the night of the accident, she and her husband were traveling east on 1-10 in the center lane. A Buick was traveling in the lane to Ross’s left. Ross noticed that the black Honda came up rapidly behind the Buick, tailgating the vehicle. Ross testified that the driver of the black Honda was driving fast and in an aggressive and erratic manner. Ross stated that the erratic driving of the black Honda made her very uncomfortable; therefore, Ross sped up to get away from the vehicle. After Ross sped up, she looked in her rearview mirror and saw that the black Honda had swerved behind her in the center lane, driving into the path of the SUV. Ross testified that the driver of the black Honda returned to the left lane upon seeing the SUV, and the SUV swerved into the right lane to avoid hitting the black Honda. However, the driver of the SUV swerved back toward the left lane to avoid hitting other vehicles that were traveling in the right lane. Ross testified that the driver of the SUV lost control of the vehicle, crashed into the median, and flipped over once. Thurman, a passenger in the SUV, gave similar testimony regarding these events.
¶ 5. After the wreck, Ross pulled over on the shoulder of the road. The driver of the black Honda also stopped, made a U- *984 turn, drove back to the SUV, and got out of the vehicle. Ross described the driver as a short, dark-haired, thin female. Thurman testified that she blacked out after the SUV crashed into the median. Upon regaining consciousness, Thurman called out to the other passengers of the SUV, but her calls went unanswered. Thurman crawled out of the back of the SUV and stood on the side of the road. Thurman testified that after she exited the SUV, a hysterical woman, later identified as Teston, approached her screaming, crying, and apologizing for the accident. Based on Teston’s behavior, Thurman assumed that she caused the accident.
¶ 6. Officer Wesley Brantley of the Biloxi Police Department arrived at the scene of the accident at 7:32 p.m. Upon arriving, Officer Brantley interviewed the witnesses. First, he spoke to Teston and Jason Stewart, a passenger in Teston’s vehicle. Officer Brantley testified that his initial contact with Teston was very brief. Teston identified herself as the driver of the black Honda and told Officer Brantley that she witnessed the accident, failing to mention her involvement in the accident. Officer Brantley asked both Teston and Stewart to write a statement and requested their driver’s licenses.
¶ 7. Afterward, Officer Brantley spoke to other witnesses and ran the driver’s licenses that he had collected. Officer Brantley went to speak to Teston for a second time and noticed that her speech was slurred, she was mumbling and confused, and her eyes were dilated and glassy. Officer Brantley believed that Teston was impaired, but he did not smell any alcohol on her breath. After interviewing Teston, Officer Brantley spoke to Ross, who told him that the driver of the black Honda caused the accident.
¶ 8. Shortly thereafter, dispatch contacted Officer Brantley and informed him that Teston’s driver’s license was suspended for failure to pay a ticket. Then, at 8:58 p.m., Officer Brantley arrested Teston for driving with a suspended license. After being placed under arrest, Teston asked Officer Brantley to retrieve her medication from the console of her vehicle. Officer Brant-ley testified that he found a bottle of Lor-cet in the console. However, the Lorcet was actually prescribed to Stewart. Upon finding the medication, Officer Brantley advised Teston of her Miranda rights and asked her how many Lorcets she had taken that day. Teston responded that she had taken two Lorcets. Officer Brantley asked Teston if she had taken any other medication, and Teston responded that she had taken a Xanax pill and a Goody’s PM right after the accident to calm her down.
¶ 9. Officer Brantley waited for a tow truck to arrive so that Teston’s vehicle ‘could be towed to the police department. After the tow truck arrived, Officer Brant-ley took Teston to the police department, and the tow truck followed. While conducting an inventory of Teston’s vehicle, police'officers found one bottle of Xanax, one bottle of Soma, and two bottles of Lorcet, all of which were prescribed to Teston, in the glove compartment of the black Honda. While at the police station, Teston was interviewed by another officer. After the interview, Officer Brantley asked Teston if she would consent to a blood test, and she agreed. Officer Brantley transported Teston to the hospital, and her blood sample was drawn at 10:09 p.m. The blood test revealed that Teston had 110 nanograms per milliliter (ng/ml) of hydro-codone in her system.
¶ 10. On April 4, 2005, Teston was indicted for eight counts of driving under the influence and negligently causing the death or serious injury of another. Counts I, II, III, and IV were specific charges and charged Teston with driving under the in *985 fluence of hydrocodone. Counts V, VI, VII, and VIII were general charges, not specifically indicating any drug. The trial court granted Teston’s motion for a directed verdict on Counts V, VI, VII, and VIII of the indictment, stating that the State failed to present evidence of impairment under any substance besides hydrocodone. Teston also made a motion in limine to exclude expert testimony by Dr. Edward Barbieri regarding Teston’s level of impairment at the time of the accident. The trial court denied the motion. Dr. Barbi-eri testified that Teston was impaired at the time of the accident. Conversely, Dr. Robert Ryan, Teston’s expert witness, testified that Teston could not have been impaired at the time of the accident.
¶ 11. On January 18, 2007, the jury found Teston guilty of three counts of driving under the influence of hydrocodone and negligently causing the death of Lindsay, Maksim, and Beth and one count of driving under the influence and negligently causing serious injury to Joshua. Teston was sentenced to serve consecutive terms of fifteen years on each count, for a total of sixty years, with thirty years suspended and five years of post-release supervision, in the custody of the MDOC, leaving Te-ston with thirty years to serve.
ANALYSIS
I. Whether the trial court erred by allowing the State to proceed to trial on Counts V, VI, VII, and VIII of the indictment.
¶ 12. Teston argues that her indictment subjected her to double jeopardy, caused substantial prejudice to her defense, and violated her constitutional right to be informed of the charges filed against her. Conversely, the State argues that Teston suffered no prejudice from her indictment because the trial court granted her a directed verdict on Counts V, VI, VII, and VIII.
¶ 18. “Double jeopardy allows a defendant to be protected against ... multiple punishments for the same offense.” Houston v. State, 887 So.2d 808, 814(¶ 23) (Miss.Ct.App.2004) (citing Greenwood v. State, 744 So.2d 767, 770(¶ 14) (Miss.1999)). The same elements test is used to determine whether or not double jeopardy attaches. Id. If the offenses contain the same elements, “they are the ‘same offense’ and double jeopardy bars additional punishment and successive prosecution.” Id.
¶ 14. Teston was indicted for eight counts of driving under the influence and negligently causing death or serious injury to another pursuant to Mississippi Code Annotated section 63 — 11—30(1)(b) and (5) (Supp.2008). Section 63 — 11—30(1)(b) and (5) provides in pertinent part that:
(1) It is unlawful for any person to drive or otherwise operate a vehicle within this state who ... (b) is under the influence of any other substance which has impaired such person’s ability to operate a motor vehicle....
[[Image here]]
(5) Every person who operates any motor vehicle in violation of the provisions of subsection (1) of this section and who in a negligent manner causes the death of another or mutilates, disfigures, permanently disables or destroys the tongue, eye, lip, nose or any other limb, organ or member of another shall, upon conviction, be guilty of a separate felony for each such death, mutilation, disfigurement or other injury and shall be committed to the custody of the State Department of Corrections....
¶ 15. In Counts I, II, III, and IV, Te-ston was specifically indicted for driving under the influence of hydrocodone and *986 negligently causing the death or serious injury of another, with one count for each victim. Counts V, VI, VII, and VIII charged Teston with the same crime. However, these four counts did not specifically name any substance that Teston was allegedly driving under the influence of. Teston filed several motions to dismiss Counts V through VIII of the indictment. The State explained that it expected Te-ston to attack the credibility of the blood test because Teston admitted to taking Xanax; however, her blood test came back negative for Xanax. The State argued that the other counts were needed to fall back on in the event that the jury determined that the blood test was not reliable. The trial court elected to rule on the motions after the State had an opportunity to present evidence on the charges. After the prosecution rested, Teston moved for a directed verdict. The trial court denied the motion and announced that it would rehear the motion after the defense put on its case. Teston later renewed her motion for a directed verdict. The trial court granted the motion in regard to Counts V through VIII, stating that there was no evidence that Teston was impaired by any substance other than hydrocodone.
¶ 16. Based on our review of the record, we find that the trial court did not err in allowing the State to proceed on the indictment. Given the language of the statute, the State was not required to specifically list the substance or substances that Teston allegedly was driving under the influence of at the time of the accident. Teston was aware that the State planned to present evidence that she had taken Lorcet, Xanax, and Soma, regardless of whether her blood tested positive for the drugs. Thus, Teston was aware of the charges against her. Most important, when the allegations were not proven, the trial court properly granted Teston a directed verdict on Counts V, VI, VII, and VIII. Teston was only convicted of one count of driving under the influence of hydrocodone and negligently causing the death or injury of another for each death or injury so caused. Therefore, we find that Teston’s argument is without merit.
II. Whether the trial court erred by denying Teston’s motion to suppress her blood test results when Teston’s blood was drawn more than two hours after the accident.
¶ 17. The admissibility of evidence is left to the sound discretion of the trial court. Jones v. State, 913 So.2d 436, 438(¶ 5) (Miss.Ct.App.2005) (quoting White v. State, 742 So.2d 1126, 1134(¶ 29) (Miss.1999)). This Court will not disturb a trial court’s ruling absent a finding that the trial court abused its discretion. Id.
¶ 18. Teston argues that the trial court erred by denying her motion to suppress her blood test results because her blood was not drawn until three hours after the accident, in violation of Mississippi Code Annotated section 63-11-8 (Rev.2004). The State contends that the trial court properly allowed Teston’s blood test results into evidence because the statute’s time requirement is not strictly applied.
¶ 19. Section 63-11-8(1) provides in pertinent that:
The operator of any motor vehicle involved in an accident that results in a death shall be tested for the purpose of determining the alcohol content or drug content of such operator’s blood, breath or urine. Any blood withdrawal required by this section shall be administered by any qualified person and shall be administered within two (2) hours after such accident, if possible. ...
(Emphasis added). The provision to draw blood within two hours of an accident is not an unyielding mandate. See Wither *987 son v. State, 731 So.2d 1173, 1177(¶ 12) (Miss.1999). Rather, we have held that in light of the circumstances, the statute requires substantial compliance. See Wash v. State, 790 So.2d 856, 859(¶ 10) (Miss.Ct.App.2001). In Wilkerson, the supreme court held that the results of a blood test performed more than two hours after an accident were properly admitted into evidence. Wilkerson, 731 So.2d at 1177(¶ 11).
¶ 20. In Wilkerson, the defendant’s blood sample was not drawn until two and a half hours after the accident. Id. The supreme court found that section 63-11-8 stated that the blood test should be performed within two hours, if possible. Id. at (¶ 12) (citing Miss.Code Ann. § 63-11-8 (1972)). The supreme court found that the delay in the defendant’s blood test was caused by the travel time to the hospital and the time it took for the nurse to obtain permission from her supervisor to perform the blood test. Id. Thus, the supreme court held that the trial court did not err by admitting the results of the blood test into evidence because the police officer substantially complied with the statute. Id.
¶ 21. Also, in Wash, the defendant’s blood sample was not drawn until two and a half hours to three hours after the accident. Wash, 790 So.2d at 858(¶ 4). This Court stated that “[w]ere this two[-]hour time frame necessary to ensure the integrity of the test results, it is doubtful that the [L]egislature would have included [the words ‘when possible’] in the statute.” Id. at 859(¶ 10). This Court found that there was no evidence that the police officers deliberately delayed the test results, and the Court did not find that the defendant was prejudiced by the delay. Id. Thus, the Court found that the defendant’s argument was without merit.
¶ 22. In the present case, Officer Brantley testified that dispatch called and informed him about the accident at 7:18 p.m. He arrived on the scene at 7:32 p.m. After arriving at the scene, Officer Brant-ley identified the witnesses. His initial contact with Teston was brief. During his second contact with Teston, Officer Brant-ley noticed that she was impaired. However, Officer Brantley was not aware of Teston’s involvement in the accident at that time. Officer Brantley arrested Te-ston for driving with a suspended driver’s license at 8:53 p.m. After her arrest, Te-ston asked Officer Brantley to get her medication out of her vehicle. At that time, Officer Brantley saw the prescription medications in Teston’s vehicle and asked her how many pills she had taken that day. Then, Officer Brantley had to wait for a tow truck to arrive so that the tow truck could follow him back to the police station with Teston’s vehicle. While Teston was questioned at the police station, Officer Brantley obtained her consent to perform a blood test. Then, he transported Teston to the hospital, and the blood test was administered at 10:07 p.m.
¶ 23. Based on our review of the record, we find no evidence of deliberate delay on behalf of Officer Brantley. The evidence shows that Officer Brantley was not immediately aware that Teston was under the influence, and he was not immediately aware of her involvement in the accident. Further delay was caused by the time it took for the tow truck to arrive, the travel time to the police station, and the travel time to the hospital. Also, we do not find any evidence that Teston was prejudiced by the lapse in time. Thus, we find that the trial court did not err by admitting Teston’s blood test results into evidence.
III. Whether the trial court erred by allowing the State’s expert to testify and give his opinion regarding Te-ston’s level of impairment at the time of the accident.
*988 ¶ 24. Teston argues that the trial court erred by allowing Dr. Barbieri, the State’s expert witness, to testify regarding Te-ston’s level of impairment for two reasons: (1) Dr. Barbieri’s opinions were obtained based upon an inaccurate and incomplete hypothetical, and (2) Dr. Barbieri’s testimony was not based on credible, scientific evidence. Conversely, the State maintains that the prosecutor posed an accurate and complete hypothetical to Dr. Barbieri, and the trial court conducted a thorough Dau-bert hearing and properly admitted Dr. Barbieri’s testimony.
¶ 25. The admissibility of expert testimony lies within the sound discretion of the trial court. See Miss. Transp. Comm’n v. McLemore, 863 So.2d 31, 34(¶ 4) (Miss.2003). This Court reviews the trial court’s admittance of expert testimony under an abuse of discretion standard. Id. Therefore, this Court will not disturb the trial court’s ruling unless it is clear that the discretion was arbitrary and clearly erroneous, amounting to an abuse of discretion. Id.
¶ 26. Mississippi Rule of Evidence 702 addresses testimony by experts, stating that:
If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.
Our supreme court adopted the standard set forth in Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579, 589-97, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993) to determine the admissibility of expert testimony. See McLemore, 863 So.2d at 35-40 (¶¶ 6-25). The Daubert test requires a two-prong inquiry: (1) the trial court must determine whether the expert testimony is relevant, meaning that it must assist the trier of fact; and (2) the trial court must determine whether the proffered expert testimony is reliable. Id. at 38 (¶ 16) (citations omitted).
a. Whether the hypothetical posed by the State was based on sufficient and accurate facts.
¶ 27. Rule 702 provides that expert testimony must be based upon sufficient facts or data. M.R.E. 702. Teston argues that the State obtained the testimony with an inaccurate and incomplete hypothetical.
¶ 28. First, Teston complains that the State mischaracterized witness testimony regarding her driving, describing Teston’s driving as “very erratic.” Ross did testify that Teston was driving in an erratic and aggressive manner. Although she did not use the term “very” erratic, we find that Teston’s complaint here is without merit.
¶ 29. Next, Teston complains that the State omitted facts showing that Teston remained in control of her vehicle. However, defense counsel posed a hypothetical to Dr. Barbieri during cross-examination, asking whether someone under the influence of hydrocodone would be able to safely operate a vehicle. Therefore, we find that the hypothetical was based on sufficient and accurate facts. This complaint is also without merit.
¶ 30. Last, Teston argues that the State failed to mention that Officer Brantley did not notice any signs of impairment during his initial contact with Teston. However, the trial court added the following to the hypothetical:
*989 THE COURT: Dr. Barbieri, assuming in addition to those characteristics [the State] gave to you as part of this hypothetical, you also considered that within minutes of the accident one of the officers identified Ms. Teston as a potential witness, had a conversation with her about whether or not she observed the accident and has testified that he did not at that time observe any of the impaired conditions which he observed some 50 minutes later, being slurred speech, mumbling, confusion, etc., would that change your opinion?
DR. BARBIERI: Well, that would tend to indicate that either he misrepresented or misobserved [sic] the first time or something happened in that interval. THE COURT: Would it change your opinion?
DR. BARBIERI: It would only — it would not change my opinion THE COURT: All right. Subject to that objection, [defense counsel], I’m going to allow the testimony.
Since the trial court intervened and supplemented the State’s hypothetical, we find that the hypothetical contained sufficient facts. Teston’s argument here is without merit.
b. Whether Dr. Barbieri’s testimony was based on credible, scientific evidence.
¶ 31. Teston raises several issues in regard to the reliability and relevance of Dr. Barbieri’s sources and the procedures he relied upon in his testimony. Specifically, Teston maintains that there is no credible, scientific basis for retrograde extrapolation of hydrocodone.
¶ 32. Daubert provides an illustrative list of factors to determine the reliability of expert testimony, which consists of the following:
[Wjhether the theory or technique can be and has been tested; whether it has been subjected to peer review and publication; whether, in respect to a particular technique, there is a high known or potential rate of error; whether there are standards controlling the technique’s operation; and whether the theory or technique enjoys general acceptance within a relevant scientific community.
McLemore, 863 So.2d at 37(¶ 13) (citation omitted). This is a non-exhaustive list of factors, and the applicability of each factor depends on the nature of the case, the area of expertise, and the subject of the testimony. Id.
¶ 33. The trial judge questioned Dr. Barbieri extensively during the Dau-bert hearing. Based on his credentials, Dr. Barbieri was qualified to be an expert in the field of forensic toxicology and pharmacology. Thus, this is not an issue in this case.
¶ 34. However, Teston argues that the study that Dr. Barbieri relied upon did not test retrograde extrapolation of hydroco-done. Teston further argues that Dr. Bar-bieri did not take multiple dosing or Te-ston’s weight into account in his analysis.
¶ 35. Dr. Barbieri testified that there were not any studies concerning retrograde extrapolation of hydrocodone. However, Dr. Barbieri testified that depending on the history of the individual in question, he could estimate the level of hydrocodone in that person’s system at a point in time prior to the administration of the blood test. He explained that he would use the level of hydrocodone found in the person’s system, his knowledge of the half-life of the drug, and his knowledge of the distribution of pharmacal kinetics. Dr. Barbieri testified that when a person takes a drug orally, the levels of the drug in the bloodstream will rise as the drug is absorbed into the body. After the drug reaches its *990 maximum effect, it will peak, and the concentration of the drug in the body will begin to decrease without further consumption of the drug. Dr. Barbieri testified that hydi’ocodone reaches its peak level between an hour and an hour and a half.
¶ 36. Dr. Barbieri relied upon the Barn-hart and Caldwell study conducted in 1977 to determine the mean peak level of hydro-codone in a person’s system. In this study, five men were each administered one 10-milligram pill of hydrocodone. Results indicated the peak level of hydroco-done is about 25 ng/ml. Dr. Barbieri agreed that weight and multiple dosing could affect the absorption rate and the level of hydrocodone in a person’s body.
¶ 37. During his testimony, Dr. Barbi-eri used several different peak levels, ranging from 20 ng/ml to 30 ng/ml, to determine the average level of hydroco-done that could be found in a person’s body after taking a 10-milligram pill. Dr. Barbieri stated that Teston would have to take four 10-milligram Lorcet pills to reach a level of 110 ng/ml. Dr. Barbieri testified that there is not a threshold limit for impairment for hydrocodone, but he personally uses 100 ng/ml of hydrocodone as the level of impairment. However, he stated that a person can be impaired at any level, and that Teston’s blood level of 110 ng/ml was significant impairment.
¶ 38. Based on Teston’s level of impairment three hours after the accident, Dr. Barbieri opined that Teston was impaired at the time of the accident. Dr. Barbieri testified that going back to the time of the accident and assuming that Teston did not take any pills after the accident, Teston would have had approximately 200 ng/ml of hydrocodone in her system, which is a lethal dosage. Dr. Barbieri testified that hydrocodone has a half-life of four hours, and you multiply the half-life by five to determine how long the drug will stay in the bloodstream. Therefore, hydrocodone could be found in a person’s bloodstream up to twenty hours after ingestion. When asked if his opinion would change if Teston stated that she had taken two Lorcets that day, Dr. Barbieri testified that his opinion would not change.
¶ 39. The trial court found that Dr. Barbieri used an established methodology for testing the presence of hydrocodone and used acceptable protocol to form his expert opinion regarding Teston’s impairment. The trial judge stated that Dr. Barbieri’s credibility was an issue for the jury to decide. Therefore, the trial judge denied Teston’s motion and allowed Dr. Barbieri’s expert testimony.
¶ 40. As previously stated, the Daubert test lists several factors to consider when determining the reliability of scientific procedures. McLemore, 863 So.2d at 37(¶ 13) (citation omitted). This list is not exhaustive, and there are times when certain factors might not be applicable in a case:
It might not be surprising that in a particular case, for example, that a claim made by a scientific witness has never been the subject of peer review, for the particular application at issue may not have ever interested any scientist....
Id. (quoting Kumho Tire Co. v. Carmichael, 526 U.S. 137, 151, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999)). Therefore, trial courts have considerable leeway in determining the reliability of expert testimony. Id. (citing Kumho Tire, 526 U.S. at 152, 119 S.Ct. 1167). Furthermore, the trial court is not required to “‘admit opinion evidence that is connected to existing data only by the ipse dixit of the expert,’ as self-proclaimed accuracy by an expert [is] an insufficient measure of reliability.” Id. (quoting Kumho Tire, 526 U.S. at 157, 119 S.Ct. 1167).
*991 ¶ 41. The Daubert test does not require trial judges to become experts themselves. Jones v. State, 918 So.2d 1220, 1227(¶ 18) (Miss.2005) (citing McLemore, 863 So.2d at 40(¶ 25)). However, “[w]e are confident that our learned trial judges can and will properly assume the role as gatekeeper on questions of admissibility of expert testimony.” Id. The record reflects that the trial judge conducted a thorough Daubert analysis, asking numerous follow-up questions to gain an understanding of Dr. Bai’bieri’s testimony.
¶ 42. Additionally, we find that Dr. Bar-bierf s testimony was sufficient to pass the Daubert test for reliability. Dr. Ryan, Teston’s expert witness, also testified that there were no studies testing retrograde extrapolation of hydrocodone. In fact, Dr. Ryan stated that there are not many studies at all testing hydrocodone because “this drug is just so old that those reports are not available.” It is apparent that, as stated in Kumho Tire, no scientists have been interested in the subject matter. Therefore, it has not been subject to peer review. Despite not having a study directly on this point, Dr. Barbieri used the half-life of hydrocodone in his analysis and the peak levels of hydrocodone from the Barn-hart and Caldwell study. Teston does not dispute that hydrocodone has a half-life of four hours. However, she complains that the Barnhart and Caldwell study did not include women. It is important to note that the peak levels for females listed in the Knoll report that Dr. Ryan relied upon and the peak levels established in the Barnhart and Caldwell study were similar. Additionally, Dr. Barbieri maintained that multiple dosing may have an effect on the rate of absorption and the peak levels of hydrocodone into the bloodstream. Further, Dr. Barbieri’s method of determining the level of hydrocodone in Teston’s system prior to the administration of her blood test can be tested.
¶ 43. The trial court is in the best position to determine relevancy and reliability of expert testimony, and in this case, the trial court determined that Dr. Barbieri’s testimony was relevant and reliable. Based upon a review of the record, we find that the trial court did not abuse its discretion by allowing Dr. Barbieri’s expert testimony.
IV. Whether the trial court erred by denying Teston’s motion for a JNOV or, in the alternative, for a new trial.
¶ 44. Teston argues that the trial court erred by denying her motion for a JNOV because the State failed to prove that she was impaired at the time of the accident. Teston also argues that the trial court erred by denying her motion for a new trial because the verdict was against the overwhelming weight of the evidence. Because the discussion of these assignments of error is related, we will address the issues together as Teston did in her brief.
¶ 45. A motion for a JNOV attacks the legal sufficiency of the evidence. Le v. State, 913 So.2d 913, 956 (¶ 163) (Miss.2005). This Court reviews the trial court’s denial of a motion for a JNOV as follows:
We must, with respect to each element of the offense, consider all of the evidence-not just the evidence which supports the case for the prosecution-in the light most favorable to the verdict. The credible evidence which is consistent with the guilt must be accepted as true. The prosecution must be given the benefit of all favorable inferences that may reasonably be drawn from the evidence. Matters regarding the weight and credibility to be accorded the evidence are to be resolved by the jury. We may reverse only where, with respect to one or more of the elements of the offense charged, the evidence so considered is *992 such that reasonable and fair-minded jurors could only find the accused not guilty.
Id. at 956-57 (¶ 163). Teston was convicted under Mississippi Code Annotated section 63—11—30(1)(b) and (5), which makes it unlawful for a person to drive under the influence and negligently cause death or injury to another. The State had the burden of proving that Teston was driving under the influence and negligently caused the deaths of Lindsay, Maksim, and Beth and negligently caused serious injury to Joshua. We must review the evidence and determine whether it is such that the jury could not find Teston guilty of the crime.
¶ 46. A motion for a new trial attacks the weight of the evidence. Le, 913 So.2d. at 957 (¶ 164). It is within the trial court’s sound discretion whether to grant or deny a motion for a new trial. Id. The trial court should grant a new trial when it finds that the verdict is so contrary to the overwhelming weight of the evidence that to allow it to stand would sanction an unconscionable injustice. Id. On appeal, this Court must accept as true the evidence that supports the verdict, and this Court will not disturb the trial court’s decision absent a finding that the trial court abused its discretion. Id.
a. Ross’s and Thurman’s Testimony
¶ 47. Teston argues that Ross’s and Thurman’s testimony that she was driving aggressively was contrary to the testimony that she was driving the same speed as the other vehicles and that she was able to stop and return to the scene of the accident safely. Teston maintains that the fact that she was able to remain in control of her vehicle is evidence that she was not impaired at the time of the accident.
¶ 48. Ross testified that Teston was driving faster than the other vehicles on the road. Ross and Thurman testified that Teston was driving in an aggressive manner. Ross also testified that Teston remained in control of her vehicle during the incident, and she was able to come to a safe stop and return to the scene of the accident.
¶ 49. Despite Teston’s ability to remain in control of her vehicle, the jury found that Teston was impaired at the time of the accident. Based upon our review of the record, we find that the evidence supports this finding. Therefore, we find that the trial court did not abuse its discretion.
b. Officer Brantley’s Testimony
¶ 50. Teston argues that, based on Officer Brantley’s testimony, the State failed to prove that she was under the influence at the time of the accident. Officer Brant-ley testified that his initial contact with Teston was brief. At that time, he had obtained Teston’s and Stewart’s driver’s licenses and gave them a form to write a statement regarding the accident. After Officer Brantley left Teston and Stewart, he interviewed other witnesses, talked to his supervisors, and reviewed the scene of the accident. Officer Brantley then returned to get Teston’s statement. At that time, he noticed that Teston was visibly impaired — slurred speech, mumbling, confused, and dilated, glassy eyes.
¶ 51. Teston argues that Officer Brant-ley’s testimony proves that she was not impaired at the time of the accident because he did not notice any signs of impairment during his initial contact with her. Teston contends that she was left unsupervised for an undetermined amount of time, and she was noticeably impaired when Officer Brantley returned. Teston maintains there was no evidence that she was impaired at the time of the accident. Therefore, through Officer Brantley’s tes *993 timony, the State failed to prove that she was impaired at the time of the accident.
¶ 52. The jury could have decided that Teston was not impaired at the time of the accident. However, the jury accepted as true that Officer Brantley was not able to properly observe Teston’s behavior during his initial contact with her and determined that Teston was impaired at the time of the accident. We find that the evidence supports this finding. Therefore, the trial court did not abuse its discretion.
c. Expert Testimony
1. Dr. Barbieri
¶ 53. Teston argues that Dr. Barbieri’s testimony failed to prove that she was impaired at the time of the accident. Dr. Barbieri testified that the peak level for one 10-milligram Lorcet pill is an average of 25 ng/ml. He explained that if Teston had taken the pills after the accident, a person would have to take four Lorcet pills to reach her level of impairment. Based on Teston’s level of 110 ng/ml of hydroco-done in her system, Dr. Barbieri opined that Teston had to be impaired at the time of the accident. He determined the amount of time hydrocodone stayed in a person’s system and multiplied the half-life of the drug times five. Using this equation, Dr. Barbieri testified that since the half-life of hydrocodone is four hours, the drug can be detected in a person’s system up to twenty hours later. Dr. Barbieri testified that a person can be impaired at any dosage no matter how small, but Te-ston’s level of hydrocodone demonstrated significant impairment.
¶ 54. Teston argues that Dr. Barbieri’s analysis did not account for multiple dosing. However, Dr. Barbieri agreed that multiple doses could affect peak levels. Teston argues that her behavior after the accident was not consistent with the effects of hydrocodone. Dr. Barbieri testified that hydrocodone is a central nervous system depressant and often made people lethargic and sleepy. He agreed that being hysterical is not an effect of hydrocodone. However, he opined that a person could be under the influence of hydrocodone and still be hysterical based on some other event.
¶ 55. Teston argues that Officer Brant-ley found no signs of impairment at the time nearest to when the accident occurred, and this is evidence that she was not impaired at the time of the accident. Dr. Barbieri agreed that if a trained DUI officer talked to a witness and did not notice any signs of impairment at that time but noticed signs of impairment later, it was obvious that something had changed between the officer’s first and second meeting with Teston. However, Dr. Bar-bieri also stated that it was possible that the officer had an opportunity to properly observe the defendant during the second extended visit.
2. Dr. Ryan
¶ 56. Dr. Ryan testified regarding the effects of multiple dosing. Dr. Ryan testified that it was not valid scientific evidence to rely upon a report involving a single dose of hydrocodone and to extrapolate back. However, Dr. Ryan admitted that there was not a study specifically demonstrating the effects of multiple doses of hydrocodone because “this drug is just so old that those reports are not available.” Dr. Ryan also relied on a single dose study and his knowledge of the effects of multiple dosing.
¶ 57. During his testimony, Dr. Ryan relied on the Knoll report, which was a two-part study involving both male and female participants. In the Knoll report, participants were given a one-milligram pill of hydrocodone, and the scientists re *994 corded the peak level of the drug in their bodies. In the second phase of the study, each participant was given a fifteen-milligram pill of hydrocodone, and each participant’s peak level was recorded. The results indicated that peak levels were higher when the participants were administered the fifteen-milligram pill. Based on this conclusion, Dr. Ryan opined that Teston could have taken two Lorcet pills after the accident, which would have caused Teston’s level of hydrocodone to rise to 110 ng/ml.
¶ 58. Dr. Ryan also testified that hydro-codone would not have caused Teston’s eyes to be dilated. He also stated that hysterical behavior is not an effect of hy-drocodone because the drug has the opposite effect — lethargy.
¶ 59. Essentially, this was a battle of the experts. The jury had a choice to accept as true the testimony of Dr. Barbi-eri or the testimony of Dr. Ryan. Based on the verdict, it is clear that the jury gave more weight and credibility to Dr. Barbi-eri’s testimony. We find that the evidence supports this decision. Thus, the trial court did not abuse its discretion.
d. The trial court did not err by denying Teston’s motion for a JNOY or, in the alternative, a motion for a new trial.
¶ 60. Teston makes many fact specific arguments. “Matters regarding the weight and credibility to be accorded to the evidence are to be resolved by the jury.” Le, 913 So.2d at 956-57(¶ 163). Based on the evidence, the jury found that, beyond a reasonable doubt, Teston was guilty of driving under the influence and negligently causing the deaths of Lindsay, Maksim, and Beth and causing serious injury to Joshua. After considering all of the evidence in the light most consistent with the verdict and giving the State all favorable inferences that may be reasonably drawn from the evidence, we find that in regard to the element of impairment, the evidence was such that the jury could find Teston guilty. Also, when accepting as true the evidence favorable to the State, we find that the verdict was not contrary to the overwhelming weight of the evidence. Therefore, we find that the trial court did not err by denying Teston’s motion for a JNOV and her motion for a new trial. Teston’s arguments are without merit.
V. Whether the trial court erred by refusing to allow Teston’s recorded statement into evidence and by prohibiting defense counsel from questioning Officer Brantley about the recorded statement.
¶ 61. Teston argues that the trial court erred by refusing to admit her recorded statement taken at the police department into evidence. Teston maintains that the State was allowed to mislead the jury by only offering the statement she made at the scene of the accident into evidence. Also, Teston argues that the trial court erred by prohibiting her from questioning Officer Brantley about the recorded statement.
¶ 62. Teston relies on Mississippi Rule of Evidence 106 in support of her argument. Rule 106 states that:
When a writing or recorded statement or part thereof is introduced by a party, an adverse party may require him at that time to introduce any other part or any other writing or recorded statement which ought in fairness to be considered contemporaneously with it.
M.R.E. 106. Teston contends that the statement she made at the scene of the accident and the statement she made at the police department are one statement. Therefore, she claims that she should have *995 been allowed to admit the recorded statement into evidence. We fail to discern this logic.
¶ 63. At the scene of the accident, Te-ston told Officer Brantley that she took two Lorcet pills that day. She later told him that she took a Xanax and a Goody’s PM after the accident. Officer Brantley failed to ask Teston what time she took the Lorcet pills. At the police department, Teston told an investigator that she took one Lorcet pill that morning, and she took two more Lorcet pills after the accident in addition to the Xanax and Goody’s PM. Based on this evidence, Teston gave two separate statements, at two separate locations, and at two separate times. It is obvious that Teston attempted to introduce her recorded statement into evidence as a self-serving statement.
¶ 64. This Court has held that a defendant has no right to introduce a self-serving statement into evidence in lieu of taking the stand. See Jackson v. State, 766 So.2d 795, 805(¶ 29) (Miss.Ct.App.2000). In Jackson, the trial court precluded defense counsel from eliciting testimony regarding a statement in which the defendant denied his involvement in the crime. Id. at 804(¶ 26). This Court stated that “hearsay statements such as these are inadmissible when there has been no testimony of any kind offered to support them,” especially when the defendant chooses not to testify. Id. at 805(¶ 29) (quoting Clanton v. State, 539 So.2d 1024, 1028 (Miss.1989)). Thus, the Court found that the trial court did not err by prohibiting defense counsel from eliciting testimony regarding the defendant’s self-serving statement because he was not subject to cross-examination. Id.
¶ 65. Like the defendant in Jackson, Teston also seeks to introduce a self-serving statement into evidence without being subject to cross-examination. Teston has no right to introduce such a statement into evidence in lieu of taking the stand to testify to the matter herself. Thus, we find that the trial court did not err by denying Teston’s motion to admit the recorded statement into evidence, and the trial court did not err by prohibiting defense counsel from eliciting testimony regarding this statement.
VI. Whether the trial court erred by reversing its ruling on Teston’s motion in limine and allowing the State to introduce evidence of Teston’s arrest for driving with a suspended driver’s license.
¶ 66. Teston argues that the trial court erred by reversing its ruling on her motion in limine, which would have prohibited the State from introducing evidence of her arrest for driving with a suspended driver’s license. Teston contends that the evidence of her arrest was irrelevant and used to prejudice the jury. Also, Teston argues that the trial court’s decision to reverse its ruling on her motion after voir dire violated her right to a meaningful voir dire.
¶ 67. Mississippi Rule of Evidence 401 defines relevant evidence as “evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.” Pursuant to Mississippi Rule of Evidence 402, irrelevant evidence is not admissible.
¶ 68. In her motion in limine, Te-ston sought to exclude any mention of her arrest. The State confessed that it would not be admissible, and the trial court granted the motion. After voir dire, the State made a motion for the trial court to reconsider its ruling. The State explained that it intended to introduce evidence of the arrest as an explanation of why Officer Brantley did not administer Teston a field *996 sobriety test. Defense counsel admitted that it intended to vigorously cross-examine Officer Brantley on this point. The trial court reconsidered its ruling and determined that a fair assessment of the facts could not be presented to the jury without allowing the State, during its direct examination, to introduce evidence of Teston’s arrest. Thus, the trial court granted the State’s motion. The trial court also instructed the jury that the evidence of the arrest could not be used as evidence of Testoris guilt to the crimes charged.
¶ 69. Giving deference to the trial court, we find that the evidence of Teston’s arrest was relevant, not only in regard to why a field sobriety test was not performed, but also to explain the sequence of events leading up to Testoris blood test. Relying upon the trial court’s initial ruling on her motion in limine, Teston states that her defense counsel did not question the venire regarding potential prejudice based on Testoris arrest. We agree that Teston was entitled to a meaningful voir dire. However, the trial judge did instruct the selected jurors that they could not consider evidence of Testoris arrest as an inference of guilt. “[Wjhen a trial court instructs the jury, it is presumed the jurors follow the instructions of the court.” Grayson v. State, 879 So.2d 1008, 1020(¶ 32) (Miss.2004) (quoting Williams v. State, 684 So.2d 1179, 1209 (Miss.1996)). Thus, this Court presumes that the jury did as it was instructed to do. For the foregoing reasons, we find that the trial court did not err in reversing its ruling on Testoris motion in limine after voir dire was conducted.
VII. Whether the State made improper statements regarding Testoris failure to testify.
¶ 70. Teston argues that the trial court erred by denying her motions for a mistrial because the State improperly commented on her failure to testify during its opening statement and closing statement. The State maintains that Teston failed to make a contemporaneous objection to the comment allegedly made during the opening statement, and the comment made in its closing argument was not a comment on Testoris failure to testify.
¶71. It is within the trial court’s sound discretion to grant or to deny a motion for a mistrial. Wright v. State, 958 So.2d 158, 161(¶6) (Miss.2007) (citing Shelton v. State, 853 So.2d 1171, 1183(¶ 41) (Miss.2003)). This Court reviews a trial court’s denial of a motion for a mistrial under an abuse of discretion standard. Id. (citing Pulphus v. State, 782 So.2d 1220, 1223(¶ 10) (Miss.2001)).
¶ 72. A defendant has a constitutional right not to take the stand in his or her own defense. Id. at 161(¶ 7) (citing U.S. Const. amend. V; Miss. Const. art. 3, § 26). To protect this right, attorneys are prohibited from making a comment on the defendant’s failure to testify. See Dora v. State, 986 So.2d 917, 923(¶ 11) (Miss.2008); see also Whitlock v. State, 941 So.2d 843, 845-46(¶ 7) (Miss.Ct.App.2006). Each comment should be examined on a case-by-case basis and examined within the context in which it was made. See Dora, 986 So.2d at 923(¶ 12); see also Whitlock, 941 So.2d at 846(¶9). If the trial court finds that an improper comment was made, “the defendant is entitled to a mistrial.” Davis v. State, 970 So.2d 164, 171(¶ 20) (Miss.Ct.App.2006) (citation omitted).
a. Comments Made in Opening Statement
¶ 73. The first comment of which Te-ston complains occurred during the State’s *997 opening statement. The prosecutor stated that:
This is not an accident that just happened. She chose to fly down the highway. She chose to pull in front of that car. She chose to do that drug. Those were her decisions, and she can’t come here now and say, oops, and we’re all sorry about the dead kids. That’s just not how it works.
We anticipate the evidence to prove that she’s guilty of all of these offenses, and we ask that you find her responsible for her own actions and find her guilty as charged.
At the conclusion of the State’s opening statement, defense counsel moved for a mistrial on the ground that the State improperly commented on Teston’s failure to testify. The trial court noted that there was no contemporaneous objection made during the course of the argument. Despite defense counsel’s failure to make a proper objection, the trial court considered the comment in the context of the entire opening statement, and the court overruled the motion.
¶ 74. After considering the comment within the context in which it was made, we find that the prosecutor’s comment did not amount to a comment on Teston’s failure to testify. This Court has held that: “[T]he [S]tate is entitled to comment on the lack of any defense, and such comment will not be construed as a reference to the defendant’s failure to testify by innuendo and insinuation.” Wright, 958 So.2d at 161(¶ 7) (citing Shook v. State, 552 So.2d 841, 851 (Miss.1989)). Based on our review of the record, we find that the prosecutor’s comment made during opening statement did not directly or indirectly refer to Teston’s failure to testify. The prosecutor simply commented on Teston’s lack of a defense to the crime. In fact, at that point of the trial, there had been no testimony from any witnesses, and it was not known whether or not Teston would elect to take the stand. For the foregoing reasons, we find that the trial court did not err by overruling Teston’s motion for a mistrial because the prosecutor did not make an improper comment on Teston’s failure to testify.
b. Comments Made in Closing Statement
¶ 75. The second comment that Teston argues was an improper comment on her failure to testify occurred during the State’s closing statement. The State maintains that the prosecutor was only responding to defense counsel’s argument in regard to why Teston did not tell Officer Brantley that she was involved in the car accident.
¶76. During its summation, defense counsel stated the following:
I don’t think if they had gone and done the blood test immediately we would be here.
[[Image here]]
Obviously when she ran across the road, she was hysterically upset. And she said, I’m sorry, I’m sorry, I’m sorry. She was very upset because of what had happened. She may have contributed to it. When you read her statement you’ll have in evidence back there, keep in mind, you know, it’s difficult to say, okay, I caused this accident. All right? That’s a hard thing to do with these kids and what she’s seeing out there. And from her perspective, she doesn’t really know that she cause[d] it.
In the State’s closing argument, the prosecutor made the following statements:
When the defendant was asked what did she do, what was her involvement in the event, what did she do? She lied. So if she would have wanted that blood tested *998 right then, if she thought it was an issue, she could have said, look, I’m clean as can be, let’s go ahead and get a test. No. She lied. I didn’t have any involvement with this. I was way up there. I saw the car. But read it again. I saw the car behind me.
So under the first theory, even the defense theory, she’s just a liar. And if she’s lying about that, we’ll get to the other things that she’s lying about. So if she lies about that, what does she get to do? You’re exactly right. She gets to take advantage of the fact, after having killed these children, to wait as long as possible with her fingers crossed until her hydrocodone level may go down. It may be hours.
So they want to blame me or the State of Mississippi for not taking her blood because she’s a liar. She’s the one that delayed this process. Nobody else. If she would have approached anybody right off the bat and says [sic], I did it, I’m sorry, you could bet we’d still be here, and you could bet we’d be in the same situation we are right now. She can’t come here with a straight face and tell you I lied for whatever kind, sweet reason counsel opposite might have you believe and just—
(Emphasis added). Defense counsel then objected to the prosecutor’s comment, and the trial court overruled the objection. The prosecutor continued his argument and stated that:
—and say, well, maybe we got a little benefit of time, but it’s not our fault because the police should have. That’s just not the way it is. She lied because she’s impaired on hydrocodone, and she wanted to wait as long as she could.
Then, the trial court admonished the prosecutor to direct his Comments to the jury.
¶ 77. Teston maintains that the prosecutor’s comment — “She can’t come here with a straight face and tell you I lied for whatever kind, sweet reason counsel opposite might have you believe” — is an improper comment on her failure to testify. Viewed in isolation, this comment may be construed as an improper comment on Te-ston’s failure to testify. However, the comment must be reviewed within the context in which it is made. See Whitlock, 941 So.2d at 846(¶ 9) (citation omitted).
¶ 78. In Wright, the supreme court stated that:
There is a difference, however, between a comment on the defendant’s failure to testify and a comment on the failure to put on a successful defense. The [S]tate is entitled to comment on the lack of any defense, and such comment will not be construed as a reference to the defendant’s failure to testify by innuendo and insinuation.
Wright, 958 So.2d at 161(¶ 7) (internal citation omitted). The Court further stated that:
[N]ot every comment regarding the lack of any defense is automatically deemed to point toward the defense’s failure to testify. Attorneys are to be given wide latitude in making their closing arguments.
Id. at 166(¶ 24) (internal citation omitted). Based upon our review of the record, we find that the prosecutor did not make an improper statement on Teston’s failure to testify.
¶ 79. In its closing statement, defense counsel argued that the blood evidence was prejudicial because Officer Brantley failed to have Teston’s blood tested immediately. One of the State’s arguments is that Teston did not inform Officer Brant-ley that she was involved in the accident. In response to this argument, defense counsel stated in its summation that Te-ston saw the accident in her rearview mir *999 ror. Thus, she was not aware that she caused the accident. Defense counsel also argued that it was difficult for Teston to admit to her involvement because of the nature of the accident. In response to defense counsel’s comments, the prosecutor stated that Teston knew that she caused the accident and lied to Officer Brantley about her involvement because she did not want him to find that she was under the influence.
¶ 80. When viewed in the context of the entire argument, the disputed statement— “She can’t come here with a straight face and tell you I lied for whatever kind, sweet reason counsel opposite might have you believe” — is not a comment on Teston’s failure to testify. The prosecutor simply responded to the comments that defense counsel made during closing argument. Therefore, we find that the trial court did not err by denying Teston’s motion for a mistrial.
VIII. Whether the trial court erred by denying Teston’s circumstantial-evidence instruction.
¶ 81. Teston argues that the trial court erred by denying the circumstantial-evidence instruction because the State did not present any direct evidence that she was driving the black Honda that caused the accident. We find that this issue is without merit.
¶ 82. A circumstantial-evidence instruction is warranted where the State cannot produce an eyewitness to the crime or cannot get a confession from the alleged perpetrator. Davis v. State, 914 So.2d 200, 208(¶ 41) (Miss.Ct.App.2005) (citing Stringfellow v. State, 595 So.2d 1320, 1322 (Miss.1992)). In these instances, the trial court is required to give a circumstantial-evidence instruction because the State’s case against the defendant would be purely circumstantial. Brown v. State, 961 So.2d 720, 728(¶ 18) (Miss.Ct.App.2007) (citing Jones v. State, 797 So.2d 922, 928(¶26) (Miss.2001)). However, the trial court is not required to give a circumstantial-evidence instruction where the State presents direct evidence of the crime. Id. (citations omitted).
¶ 83. Teston maintains that the State’s evidence was purely circumstantial because neither Ross nor Thurman could identify her as the driver of the black Honda. During the trial, Ross testified that the driver of the black Honda was a short, dark-haired, thin female. When asked if she could identify in the courtroom the driver of the vehicle, Ross responded that she was not certain if she could do so. However, Ross testified that she assumed that Teston was the driver of the vehicle because she saw Stewart standing next to the passenger side of Teston’s car. Thurman testified that she assumed that Teston was the driver of the black Honda because Teston approached her in a hysterical manner, apologizing for the accident.
¶ 84. Additionally, Officer Brantley testified that Teston identified herself as the driver of the black Honda. Teston also argues that although she identified herself to Officer Brantley as the driver of the black Honda, Officer Brantley did not ask her if she was driving at the time of the accident. We find that this is of no consequence. Based on our review of the record, we find that the State presented direct evidence identifying Teston as the driver of the black Honda, and we did not find any evidence in the record that would refute this fact. Thus, we find that the trial court did not err by denying Teston’s circumstantial-evidence instruction.
IX. Whether Teston’s sentence was grossly disproportionate to the crime.
¶ 85. Teston argues that her sentence is grossly disproportionate to the *1000 crime because other defendants received less time for the same offense. If the defendant is convicted of the crime charged, her sentence will be determined within the sound discretion of the trial court. Moody v. State, 964 So.2d 564, 567(¶ 13) (Miss.Ct.App.2007) (citing Jones v. State, 885 So.2d 83, 88(¶ 12) (Miss.Ct.App.2004)). On appeal, this Court will not disturb a sentence imposed by the trial court when that sentence falls within the statutory guidelines. Id. (citing Triplett v. State, 840 So.2d 727, 732(¶18) (Miss.Ct.App.2002)). “However, where a sentence is ‘grossly disproportionate’ to the crime committed, the sentence is subject to attack on the grounds that it violates the Eighth Amendment prohibition of cruel and unusual punishment.” Grimes v. State, 909 So.2d 1184, 1188(¶ 13) (Miss.Ct.App.2005) (quoting Stromas v. State, 618 So.2d 116, 122 (Miss.1993)).
¶ 86. The trial court sentenced Teston pursuant to Mississippi Code Annotated section 63-11-30(5). Subsection (5) provides that anyone who violates the statute “shall be committed to the custody of the State Department of Corrections for a period of time of not less than five (5) years and not to exceed twenty-five (25) years for each [offense]-” Miss.Code Ann. § 63-11-30(5). The determination of whether the sentences for multiple violations should run consecutively or concurrently is within the trial court’s discretion. Id.
¶ 87. In this case, Teston was found guilty on all four counts and was sentenced to serve consecutive terms of fifteen years on each count, totaling sixty years, with thirty years suspended and five years of post-release supervision, leaving Teston with thirty years to serve. We find that Teston’s sentence is not grossly disproportionate to the crimes committed because the trial court sentenced her within the guidelines provided by the statute. Thus, we find that Teston’s argument is without merit.
¶ 88. THE JUDGMENT OF THE CIRCUIT COURT OF HARRISON COUNTY OF CONVICTION OF COUNTS I, II AND III-DRIVING UNDER THE INFLUENCE AND NEGLIGENTLY CAUSING THE DEATH OF ANOTHER, AND COUNT IV-DRIVING UNDER THE INFLUENCE AND NEGLIGENTLY CAUSING SERIOUS INJURY TO ANOTHER, AND SENTENCE OF FIFTEEN YEARS ON EACH COUNT, WITH THIRTY YEARS SUSPENDED AND FIVE YEARS OF POST-RELEASE SUPERVISION, TO BE SERVED CONSECUTIVELY IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANT.
LEE AND MYERS, P.JJ., IRVING, CHANDLER, BARNES, ISHEE, ROBERTS AND CARLTON, JJ., CONCUR. GRIFFIS, J., NOT PARTICIPATING.